## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SUBURBAN DODGE OF** | ) | No. 04-B-42931 |
| **BERWYN, INC. D/B/A SUBURBAN** | ) | |
| **DODGE-ISUZU-SUZUKI, AN** | ) | |
| **ILLINOIS CORPORATION,** | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| **LEPETOMANE XXII, INC., not** | ) | |
| **individually, but solely as estate** | ) | |
| **representative of Suburban Dodge of** | ) | |
| **Berwyn, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 06-01727 |
| | ) | |
| **DAIMLERCHRYSLER MOTORS** | ) | |
| **COMPANY, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

*FILED*

*APR 2 4 2007*

*EUGENE R. WEDOFF*
*BANKRUPTCY JUDGE*

### MEMORANDUM OF DECISION

This adversary is before the court on the motion of defendant DiamlerChrysler

Financial Services Americas LLC ("Financial") to dismiss pursuant to Federal Rule of

Bankruptcy Procedure 7012(b), which incorporates Federal Rules of Civil Procedure

12(b)(6). The underlying adversary involves claims by the estate representative of

debtor Suburban Dodge of Berwyn, Inc. ("Suburban") that defendants Financial and

Financial's sister DaimlerChrysler Motors Company, LLC ("Motors") discriminated

against Suburban's minority customers and drove Suburban out of business.[1] The

---

[1] Pursuant to section 6.2 of the confirmed plan, Lepetomane XXII, Inc. was appointed
estate representative to pursue these claims.

complaint asserts claims against Financial for violations of the Automobile Dealers'
Day in Court Act (Count I), violations of the Illinois Motor Vehicle Franchise Act
(Count II), breach of contract (Count IV), and tortious interference with prospective
business or economic advantage (Count V). (Count III of the complaint does not seek
relief against Financial.) As discussed below, the motion to dismiss will be denied with
respect to Counts I and II, and granted with respect to Counts IV and V.

### Jurisdiction

Title 28 U.S.C. § 1334(b) grants district courts jurisdiction over matters that are
related to a case under Title 11. The pending adversary is "related to" the underlying
bankruptcy case because the claims asserted are property of the estate and
determination of those claims will affect distribution to creditors. *In re Xonics, Inc.*,
813 F.2d 127, 131 (7th Cir. 1987). Although related to the bankruptcy case, the
pending adversary proceeding is a non-core proceeding. *In re Maislin Industries, U.S.,
Inc*, 50 B.R. 943, 949 (Bankr. E.D. Mich. 1985). Pursuant to 28 U.S.C. § 157(c)(1),
this court may hear a non-core proceeding and submit proposed findings of fact and
conclusions of law to the district court. In the absence of Financial's consent to final
adjudication in this court, the decision on this matter will be incorporated into
proposed findings of fact and conclusions of law that will be submitted to the district
court after further proceedings.

### Background

Suburban, the debtor, was a dealer of Dodge, Isuzu, and Suzuki vehicles.
Located in Berwyn, Illinois, Suburban served predominately Hispanic and African-
American customers. Suburban operated under a franchise agreement with Motors
and two financing agreements with Financial. The complaint alleges that Motors and
Financial discriminated against minority customers of Suburban, pressured Suburban

2

to shift its attention to white customers, and punished Suburban when it refused. The complaint further alleges that Motors and Financial interfered with a sale of the dealership to a part-owner on account of his ethnicity—he is Hispanic—and wrongfully delayed an asset sale in retaliation for Suburban's failure to capitulate to their demands. Further allegations are discussed below in connection with the count to which they are relevant.

## Discussion

A motion to dismiss under Rule 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Chaney v. Suburban Bus Div. of the Regional Transp. Auth.*, 52 F.3d 623, 627 (7th Cir. 1995). For purposes of this motion, the plaintiff's factual assertions are considered to be true, and all reasonable inferences are to be construed in the plaintiff's favor. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995).

### I. Breach of Contract (Count IV)

Count IV of the estate's complaint is based on alleged breaches of the covenant of good faith and fair dealing implied in Suburban's two contracts with Financial. The complaint alleges that Financial's racially discriminatory conduct breached this implied covenant in the Retail Installment Contract and Lease Program Agreement. The complaint alleges that Financial's punitive use of floor checks and manipulation of Suburban's credit line breached the implied covenant in the Master Loan and Security Agreement.

The covenant of good faith and fair dealing is implied in all Illinois contracts. *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683, 690 (Ill. 1958). However, this

covenant is not an independent source of duties for the parties to a contract. Rather, it
is a rule of construction that requires exercises of discretion to be consistent with the
reasonable expectations of the parties. *Beraha v. Baxter Health Care Corp.*, 956 F.2d
1436, 1443 (7th Cir. 1992). Importantly, the contract itself affects the reasonable
expectations of the parties. For example, while the covenant is present in all contracts,
including employment contracts, Illinois courts have upheld the principle of at-will
employment. *See id.* at 1444 (discussing cases). The unfettered exercise of discretion
in the employment context does not conflict with the reasonable expectation of the
parties, and therefore does not breach the covenant of good faith. *Zick v. Verson
Allsteel Press Co.*, 623 F.Supp. 927, 931 (N.D. Ill. 1985). This accords with the
principle that the covenant does not alter explicit terms in the contract. *Kham &
Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1990).
Essentially, Illinois law allows parties to contract away the right to require a counter-
party to exercise discretion reasonably.

The ultimate question here is thus whether Financial, assuming the allegations
of the complaint to be true, exercised its discretion in a way that violated the
reasonable expectations of the parties. But the threshold question is whether
Suburban contracted away its right to a reasonable exercise of discretion.

### a. Retail Installment Contract and Lease Program Agreement

The complaint alleges that Suburban had relationships with several lenders and
that, when a customer required financing in order to purchase a vehicle, Suburban
would finance the purchase and then sell the lease or sales contract to one of the
lenders. Before Suburban would finance the purchase, however, it would ensure that
one of the lenders would be willing to purchase the paper from Suburban. Financial
was one of these lenders, and Financial generally offered the best terms and was

4

Suburban's primary source for retail financing. An agreement between Suburban and Financial, the Retail Installment Contract and Lease Program Agreement ("RICLPA") set out the ground rules for these transactions.

As set out in the complaint, the process went roughly like this: When a customer requested financing, Suburban would transmit certain information (name, social security number, address, etc.) to Financial to give Financial an opportunity to determine whether, and at what terms, it would purchase the lease or sales contract from Suburban. Financial's regular practice was to use an automated system that returned an answer within minutes; it held out to the public that this system was color-blind. However, the complaint goes on, because of Suburban's expansion into the Hispanic and African-American markets, Financial began to flag applications from Suburban for individual review, which took much longer. In addition, Financial offered worse terms to minority applicants than comparable white applicants. The complaint alleges that these actions breached the covenant of good faith and fair dealing.

The RICLPA contains the following relevant language on the first page, referring to Financial as "CF":

> **CF's Discretion.** CF shall have no obligation to purchase any particular Contract or Contracts from Dealer. *CF shall have absolute and total discretion with respect to which Contracts CF may agree to purchase.* CF shall have the further right at all times and in its sole discretion: (1) to determine the extent to which, and the terms and conditions under which, CF will purchase Contracts from Dealer; (2) to establish and approve the form and provisions of Contracts; (3) to determine the types of Vehicles that may be leased under a Contract purchased by CF; (4) to establish minimum equipment requirements for leased Vehicles; (5) to determine the lease and credit terms of Contracts purchased by CF; and (6) to determine the creditworthiness of each Customer. *Nothing under this Agreement,* or under any existing or future agreement or understanding between the parties, whether in writing or in the form of oral statements, or any conduct or course of dealing on the part of CF, or on the part of its officers, employees or agents, *may be construed by Dealer,* or by Dealer's owners, partners, members, shareholders, principals or management

> officials, or by any Customer, or by any court of law, or in arbitration, *to in any*
> *way obligate or commit CF to purchase any particular Contract*, or to amend,
> alter or in any way modify the discretionary nature of this Agreement.

(Emphasis added.)  This language indicates that Suburban contracted away its right to

expect reasonable behavior from Financial.  Despite Financial's public assertions that

its system was race-neutral, Suburban had no contractual basis to expect race-neutral

decisions.  Had the contract simply given Financial discretion, the covenant of good

faith would have implied a condition of reasonableness.  Here, Financial specifically

reserved the right to be unreasonable.

This interpretation of the agreement is bolstered by the fact that Financial was

not Suburban's sole source of retail financing.  Where a contract is exclusive and

provides one party controlling discretion, it is less likely that the other party would have

agreed to be the subject of caprice.  Here, however, Suburban worked with other retail

lenders as well as Financial.

Furthermore, the duty of reasonableness is more readily implied when only one

of the contracting parties is given discretion.  *Cromeens, Holloman, Sibert, Inc. v. AB*

*Volvo*, 349 F.3d 376, 395 (7th Cir. 2003).  Here, both parties had discretion; neither

party was bound to do business under the RICLPA.

### b. Master Loan and Security Agreement

In addition to being one of Suburban's retail lenders, Financial provided

Suburban's commercial financing.  A Master Loan and Security Agreement ("MLSA")

provided Suburban with the funds to purchase inventory and maintain its physical

space. As security, Financial had a lien on all of Suburban's assets.  The complaint

alleges that Financial, displeased by Suburban's expansion into the minority market,

pressured Suburban to focus on white consumers by manipulating Suburban's credit

lines and by conducting harassing inventory checks.

Like the RICLPA, the MLSA contains a paragraph allowing Financial to
exercise discretion without regard to reasonableness. This paragraph is on page two, in
boldface, and reads:

> **ABSOLUTE DISCRETIONARY NATURE OF LENDING
> RELATIONSHIP.** Lender has no obligation whatsoever, under this Agreement
> or otherwise, to make Loans to Borrower under any circumstance. Lender's
> decision to do so is and shall always be solely within Lender's exclusive
> judgment and discretion, and *Lender may refuse to make Loans to Borrower,*
> and may limit the purpose or purposes for which the proceeds of an Advance
> may be used, and may limit the amount of aggregate Loan Advances, or the
> amount of any single Advance, *for any or no reason, with or without cause.
> Nothing under this Agreement,* or any other existing or future agreement or
> understanding between the parties, whether in writing or in the form of oral
> statements, or any conduct or course of dealing on the part of Lender, or on the
> part of its officers, employees, agents, or attorneys, *may be construed by*
> Borrower, or by Borrower's owners, principals or management officials, or any
> Guarantor, or by any court of law or in arbitration, *to in any way obligate or
> commit Lender to make Loans to Borrower,* or to any third party on Borrower's
> behalf, or to amend, alter or in any way modify the discretionary nature of the
> lending relationship between Lender and Borrower. Borrower and each
> Guarantor recognize that the above provisions are essential, bargained-for
> covenants, which may not be waived or modified by Lender under any
> circumstances.

(Emphasis added.) This provision makes clear that there is no contractual basis for
challenging even malicious actions so far as they relate to the lending relationship.
Furthermore, both parties had discretion under this contract. As discussed in
connection with the RICLPA, the duty is more readily implied when a single party is
given discretion.

This right to make decisions "for any or no reason, with or without cause," does
not extend to the inspection of the collateral. Inspection is governed by an affirmative
covenant on page seven, by which Suburban agreed to permit the Lender "to inspect
the Collateral and Borrower's other properties, wherever they are located, at any
reasonable time." However, this provision does not support the estate's position
because the implied duty of good faith and fair dealing under this provision applies in

this case to *Suburban*, not Financial. Here, Suburban promised to permit Financial to
check on the inventory at any reasonable time. The implied duty of good faith (in
addition to the explicit language of the contract) thus forbade Suburban from
withholding permission unreasonably. If Financial requested access unreasonably,
Suburban was free to deny it.

The allegations set forth in the complaint do not support a claim for breach of
contract. Financial's motion will be granted with respect to Count IV.


## II. Tortious Interference (Count V)

The claim for tortious interference is based on actions Financial allegedly took
to prevent potential customers from doing business with Suburban. These actions
include refusing to finance some of Suburban's customers (or offering them poor
terms) because of their race, pressuring Suburban to cease marketing targeted at
minorities, and manipulating Suburban's credit line to pressure it to focus on selling to
whites. This cause of action requires a showing that (1) the plaintiff had a reasonable
expectation of a valid business relationship; (2) the defendant knew about it; (3) the
defendant intentionally and unjustifiably interfered with that expectancy, causing a
termination of the relationship or expectancy; and (4) the plaintiff suffered damages as
a result. *Medline Indus., Inc., v. Maersk Med. Ltd.*, 230 F.Supp.2d 857, 861 (N.D. Ill.
2002); *Fellhauer v. Geneva*, 568 N.E.2d 870, 878 (Ill. 1991).

With regard to its refusal to finance potential customers, Financial is not liable
for interference because it was a party to the expected business relationship. As a basic
principal, "a party cannot be liable in tort for interfering with its own business
relationship." *Cooper v. Durham School Services*, 2003 WL 22232833 (N.D. Ill. 2003);
*accord Laser Industries, Ltd. v. Eder Instrument Co., Inc.*, 573 F.Supp. 987, 994 (N.D.

8

Ill. 1983). The financing process required two steps: First, Suburban would finance the customer's purchase; second, Suburban would assign the contract to a lender. However, these steps were not independent. Suburban would only undertake the first step if it were assured that a lender would agree to the second step. Suburban argues that by withholding that assurance—which, as discussed above, was not required by contract—Financial interfered with the first step. The economic reality here is a single transaction between Financial and the customer, facilitated by Suburban. It is appropriate to treat this as a single three-party transaction. Therefore, Financial would be a party to the expected business relationship, and is not liable for interfering with that expectation's fruition.

Financial also argues correctly that a refusal to lend is not actionable under this tort. Under binding case law, "[b]y refusing to lend money, a bank does not 'tortiously interfere' with the use the borrower would make of the funds." *Israel Aircraft Industries Ltd. v. Sanwa Business Credit Corp.*, 16 F.3d 198, 202 (7th Cir. 1994). There is no interference because the potential customer has access to other sources of funds. That is precisely the situation here. Financial did not prevent the potential customer from buying a car from Suburban or from borrowing from another source; it just did not want to be party to the transaction.

Finally, the other alleged actions are not actionable because they were directed at Suburban. In order to state a claim for tortious interference, it is not enough for the alleged actions to affect a third party—they must be directed at a third party. *International Star Registry of Illinois v. ABC Radio Network, Inc.*, 451 F.Supp.2d 982, 992 (N.D. Ill. 2006).

The allegations set forth in the complaint do not support a claim for tortious interference. Financial's motion will be granted with respect to Count V.

### III. Automobile Dealers' Day in Court Act (Count I)

Financial argues that it cannot be held liable under the Automobile Dealers'
Day in Court Act ("ADDCA") for the actions alleged in the complaint for two reasons.
First, Financial argues that its actions did not involve a wrongful demand, and
therefore were not coercive. Second, Financial argues that the actions did not involve
Financial's failure to perform or comply with the terms of Suburban's franchise
agreement.

The ADDCA requires a manufacturer to act in good faith in performing or
complying with any of the terms or provisions of the franchise agreement. 15 U.S.C.
§ 1222. "Good faith" means to act in a fair and equitable manner so as to guarantee
that the dealer is free from coercion and intimidation from the other party. 15 U.S.C.
§ 1221(e). "[I]n order to succeed under [the ADDCA], the plaintiff must allege facts
showing coercion." *Ed Houser Enterprises, Inc. v. General Motors Corp.*, 595 F.2d
366, 369 (7th Cir. 1979). Coercion is "a wrongful demand which will result in sanctions
if it is not complied with." *TLMS Motor Corp. v. Toyota Motors Distribs., Inc.*, 1998
WL 182475, *6 (N.D. Ill. 1998).

Financial's motion argues that the complaint does not allege a wrongful *demand*
in connection with the alleged conduct. This simply is not true. The complaint clearly
alleges that Financial used its favorable contractual position as leverage to demand that
Suburban pursue non-minority customers (¶¶ 63-70), make untrue public comments
regarding Financial's past and current discrimination (¶¶ 71-79), and grant Financial a
release for past discrimination (¶¶ 79, 81, 84-86). While many of these demands were
not overt, some were quite explicit (¶¶ 76, 81).

Further, while Financial focuses its attack on whether the complaint alleges a wrongful *demand*, it should be noted that a demand may be wrongful even if the party has a contractual right to assert it. The ADDCA has the effect of modifying provisions of a contract that permit a manufacturer absolute discretion. As a result of the ADDCA, a manufacturer cannot contract away its obligation to carry out the agreement in good faith. The drafters were concerned that car manufacturers had the upper hand in the contractual relationship and passed the ADDCA to prevent manufacturers from acting coercively. *Maschio v. Prestige Motors*, 37 F.3d 908, 910 (3d Cir. 1994). In *Woodard v. General Motors Corp.*, 298 F.2d 121 (5th Cir. 1962), the court noted that a manufacturer's principal means of coercion is to threaten to terminate or refuse to renew a franchise—an exercise that would not otherwise breach the contract. 198 F.2d at 127. If the parties were "free" to contract around the ADDCA's requirement of good faith, the ADDCA would have no meaning. The complaint alleges coercion within the meaning of the ADDCA.

Financial's second argument—that the alleged misconduct did not involve its failure to perform or comply with the terms or provisions of the franchise agreement between Suburban and Motors—is misplaced. Although the ADDCA requires a party "to act in good faith in performing or complying with any of the provisions *of the franchise*," § 1222 (emphasis added), the Act defines "the franchise" broadly: "The written agreement or contract between any automobile manufacturer . . . and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract." Section 1221(b). The term "automobile manufacturer," in turn, is defined broadly to include any entity under the control of the manufacturer in connection with the distribution of cars. Section 1221(a). Case law has further expanded this definition using the principles of agency. In at least one case, the

financial arm of a manufacturer was included in this broad definition. *Colonial Ford, Inc. v. Ford Motor Co.*, 592 F.2d 1126 (10th Cir. 1979). As a matter of law, if Financial is an "automobile manufacturer" for purposes of the ADDCA, it must perform under *its* contracts with Suburban—including the RICLPA and MLSA—in good faith. The complaint alleges facts consistent with the conclusions that (1) Financial is an "automobile manufacturer" for purposes of the ADDCA, and (2) Financial failed to perform under the RICLPA and MLSA with Suburban in good faith. Therefore, Financial's motion to dismiss will be denied with respect to Count I.

### IV. Illinois Motor Vehicles Franchise Act (Count II)

Financial also moves to dismiss the claims against it that are based on 815 ILCS § 710, the Illinois Motor Vehicle Franchise Act (IMVFA). The motion specifically addresses five provisions of the IMVFA, four of which do not provide the estate a basis for relief. However, because the complaint has alleged facts sufficient for relief under section 710/4(b) of the IMVFA, Financial's motion to dismiss Count II will be denied.

#### a. Section 710/4(d)(4)

The complaint does not allege a valid claim under section 710/4(d)(4), which makes it a violation of the Act for certain parties "[t]o coerce, or attempt to coerce, any motor vehicle dealer to enter into any agreement . . . or to do any other act prejudicial to the dealer by threatening to reduce his allocation of motor vehicles or cancel any franchise or any selling agreement . . ." 815 I.L.C.S. § 710/4(d). This provision prohibits particular *methods* of coercion. This provision is inapplicable because the complaint does not allege that Financial threatened to reduce Suburban's allocation of motor vehicles or to cancel any franchise or selling agreement. The complaint alleges many attempts by Financial to coerce Suburban to act against its self-interest, but not

by the means prohibited in this provision. Denying credit to, and otherwise discriminating against minority customers, and manipulating Suburban's credit are not prohibited by this provision. The complaint does not state a valid cause of action under section 710/4(d)(4).

### b. Section 710/4(d)(5)

The complaint does not state a valid cause of action under section 710/4(d)(5), which makes it a violation of the Act for certain parties, "to require a franchisee to participate in an advertising campaign or contest or any promotional campaign, or to purchase or lease any promotional materials, training materials, show room or other display decorations or materials at the expense of the franchisee." The complaint alleges that Financial manipulated Suburban's credit in part to influence Suburban's advertising activities. (¶¶ 67, 97.) In addition, the complaint alleges that Motors pressured Suburban to switch its marketing away from minority customers in favor of white customers, in particular by participating in a barbeque give-away and a direct-mailing program, and by curtailing certain television campaigns and shopping mall advertisements. (¶¶ 99, 106.) The complaint alleges that Suburban eventually acquiesced to the demands and ceased its television and mall campaigns. In addition, the complaint alleges that Financial worked in concert with Motors in this regard.

While the complaint clearly alleges that Financial tried to influence the tenor and recipients of Suburban's advertising—and Motor's more direct actions may be attributable to Financial—the complaint does not allege that Suburban actually participated in any of Motor's favored campaigns. As Financial correctly argues, the harm that a dealer would suffer as a result of a violation of this section is the cost the dealer incurred to participate in the required campaigns at its own expense. The complaint does not allege any such harm. The loss of revenue that allegedly resulted

13

from the cessation of Suburban's television and mall campaigns is not the type of harm
that this section addresses. Therefore, the complaint does not state a valid cause of
action under section 710/4(d)(5).

### c. Section 710/4(e)(6)

The complaint does not state a valid cause of action under section 710/4(e)(6),
which limits the ability of a manufacturer, a distributor, a wholesaler, or one of their
agents to interfere with the sale or transfer of an interest in a dealership without good
cause. This section also contains an administrative procedure for determining whether
good cause exists for a manufacturer's refusal to approve a sale or transfer. If a
manufacturer intends to refuse to approve a sale or transfer, it must notify the dealer
within 60 days of receiving the dealer's application to sell or transfer. The dealer has
30 days to protest to the Motor Vehicle Review Board, which then determines whether
the manufacturer has good cause for such refusal. The MVRB is the only body
authorized to determine "good cause" under this section. This administrative review
was added to the law after *Fields Jeep-Eagle, inc. v. Chrysler Corp.*, 645 N.E.2d 946
(Ill. 1994), determined that it was unconstitutional for a court to determine whether
"good cause" exists for a dealership to be established or relocated. Such a
determination violated the separation of powers and due process because it allowed the
court excessively wide discretion, encompassing whatever factors the court might
determine. Were section 710/4(e)(6) not constrained by an administrative procedure,
it would suffer the same defect.

However, the new provision is not all encompassing. The administrative
remedy of section 710/4(e)(6) is only triggered when the dealer applies to the
manufacturer for approval of a sale or transfer, and the review process only
contemplates a manufacturer's refusal to approve of a sale or transfer. There may be

14

situations where, as alleged here, a manufacturer, distributor, a wholesaler, or one of

their agents attempts to prevent a sale or transfer *prior* to the dealer's application. The

statute does not provide a mechanism for obtaining review of such action by the

MVRB. Since *Fields Jeep-Eagle* makes it clear that courts may not determine "good

cause" in this situation, this court lacks jurisdiction to make a determination that

Financial impermissibly interfered with the sale or transfer of an interest in Suburban.

### d. Section 710/4(e)(9)

The complaint does not state a cause of action under section 710/4(e)(9), which

makes it a violation of the Act for a manufacturer, a distributor, a wholesaler, or one of

their officers, agents or representatives to require a dealer to assent to a release that

would relieve any person from liability imposed by the IMVFA. Financial would have

violated this section if, as alleged, it used its rights under the financing contract as

leverage to obtain a release from Suburban.[2] In that situation, the harm to Suburban

would have been the loss of its claims under the IMVFA. Here, Suburban never

assented to the release, and therefore never lost its claims under the IMVFA. There is

no release to void, or claims to reinstate. Rather, the complaint alleges that Financial's

exercise of its contractual rights harmed Suburban. While it is true that Suburban

would have been better off had Financial abstained from pursuing its rights under the

contract, such a detriment is not a loss within the meaning of the statute. The estate

suffered no damages as the result of Financial's alleged violation of this section.

---

[2] Threatening action that is otherwise legal may violate the statute when it is used to
obtain a release. Section 710/4(e)(9) prevents a manufacturer from conditioning a
contract on the dealer's assent to a release, even though the manufacturer has no duty
to do business with the dealer. But for this provision, its "threat" to take its business
elsewhere would be legal. Section 710/4(e)(9) prevents manufacturers from using this
leverage (which would otherwise be legal to use) to obtain a release. Likewise, a
manufacturer would violate this section if it were to use its rights under a separate
contract as leverage in an attempt to obtain a release.

Therefore, the complaint does not state a valid cause of action under section 710/4(e)(9).

### c. Section 710/4(b)

The last provision at issue is section 710/4(b), which makes it a violation of the Act for "[a]ny manufacturer, factory branch, factory representative, distributor or wholesaler, distributor branch, distributor representative or motor vehicle dealer to engage in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public." 815 I.L.C.S. § 710/4(b). The complaint alleges that Financial is a factory representative, and for authority cites an Illinois appellate case that affirmed a finding that Financial's corporate predecessor was a factory representative. *Guardino v. Chrysler Corp.*, 294 Ill.App.3d 1071, 1080, 691 N.E.2d 78, 793 (1st Dist. 1998). In that case the court gave weight to the predecessor's ability to stop the manufacturer from approving a sale of the dealership. The court thus ensured that all significant players were covered by the Act. The financial arm's ability to stop a sale indicated that it was a significant player. Here, in addition to Financial having significant power to affect Suburban's franchise, Financial is alleged to have worked directly with the manufacturer to provide "factory incentive financing." The complaint also alleges that Financial worked in concert with the distributor and the manufacturer for marketing purposes and regarding a potential sale of an ownership interest in the dealership. These facts provide a basis for treating Financial as a factory representative.

The only other case that is arguably relevant is *TLMS Motor Corp. v. Toyota Motor Distribs.*, 912 F.Supp. 329 (N.D. Ill. 1995), which held that Toyota Motor Credit Corporation was not liable under section 710/4(b). However, it appears that the

plaintiff in *TLMS Motor* did not argue that the manufacturer's financial arm was a factory representative—the opinion does not discuss that possibility.

Financial also argues that its misconduct was not "action with respect to a franchise" because it was not a party to the franchise agreement. Financial cites no authority for this reading of the statute. The complaint alleges that Financial performed its contracts with Suburban in bad faith. By attempting to coerce Suburban to alter how it managed the dealership (by discouraging advertising and sales to minorities) Financial's misconduct was certainly "action with respect to a franchise." The complaint alleges a valid cause of action under section 710/4(b).

## Conclusion

For the reasons stated above, by separate order Financial's motion to dismiss will be denied with respect to the Automobile Dealer's Day in Court Act claim (Count I) and the Illinois Motor Vehicle Franchise Act claim (Count II), and will be granted with respect to the breach of contract claim (Count IV) and the tortious interference claim (Count V).

April 24, 2007

Eugene R. Wedoff
US Bankruptcy Judge

17